UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

```
                                   .
United States of America,          .    Third Circuit: #21-3122
                                   .
         Appellant,                .
                                   .
            V.                     .
                                   .
Carolyn Jackson,                   .
                                   .
         Appellee.                 .
...................................
                                   .
United States of America,          .    Third Circuit: #21-3123
                                   .
         Appellant,                .
                                   .
            V.                     .
                                   .
John E. Jackson,                   .
                                   .
         Appellee.                 .
...................................
```

Transcript from the audio recording of the oral argument held December 15, 2022 at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania. This transcript was produced by Writer's Cramp, Inc., certified court transcribers for the United States Court of Appeals.

BEFORE CIRCUIT JUDGES:

THE HONORABLE L. FELIPE RESTREPO
THE HONORABLE THEODORE A. MCKEE
THE HONORABLE D. BROOKS SMITH

APPEARANCES:

For Appellant:                John F. Romano, Esq.
                              Office of the United States
                              Attorney
                              970 Broad Street-Rm. 700
                              Newark, NJ 07102

2

For Appellees:                    Herbert I. Waldman, Esq.
                                  Javerbaum Wurgaft Hicks Kahn
                                  Wikstrom & Sinins
                                  505 Morris Ave.
                                  Springfield, NJ 07081

                                  Louise Arkel, Esq.
                                  Office of Federal Public
                                  Defender
                                  1002 Broad Street
                                  Newark, NJ 07102

Transcribing Firm:                Writer's Cramp, Inc.
                                  1027 Betty Lane
                                  Ewing, NJ 08628
                                  609-588-8043


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1        JUDGE RESTREPO:  So, what we thought we'd do, Mr.

2    Romano, Mr. Waldman, Ms. Arkel, is it Arkel?

3        MS. ARKEL:  Arkel.  Thank you.

4        JUDGE RESTREPO:  Arkel.  I think it probably makes

5    sense for Mr. Romano to address both cases and then we'll hear

6    from defense counsel and then we'll hear the rebuttal.  So

7    does that work for you, sir?

8        MR. ROMANO:  It does, Your Honor.

9        JUDGE RESTREPO:  All right, whenever you're ready.

10       MR. ROMANO:  May it please the Court, John Romano

11   for the United States.  I'd like to reserve five minutes for

12   rebuttal.

13       JUDGE RESTREPO:  Sure.

14       MR. ROMANO:  Thank you.  As Your Honors are aware,

15   this is the third Government appeal in this case.  In the

16   previous two, this Court has found significant procedural

17   errors.  Unfortunately, at the third sentencing, the District

18   Court committed yet more serious errors.

19       JUDGE SMITH:  Unlike Judge McKee on this panel, I

20   don't have experience with the prior two iterations in the

21   matter.  So, just so I am clear, am I correctly looking at two

22   mandates from Jackson II that are at issue here?  That is,

23   first to consider the injuries holistically rather than

24   individually; and second, to apply the aggravated assault

25   guideline to counts -- in addition to Count 10, is that --

1        MR. ROMANO:  That's correct, Your Honor.

2        JUDGE SMITH:  -- what is at stake here?

3        MR. ROMANO:  Yes.

4        JUDGE SMITH:  Okay.

5        MR. ROMANO:  I think that's -- at the micro level,

6    that's what's at stake here.

7        JUDGE SMITH:  I'm always at the micro level.  When

8    you're 5'8" there's only one way of looking at it.

9        JUDGE MCKEE:  Very true.

10        MR. ROMANO:  I would say, Your Honor, at the macro

11    level, if you like.  This -- we're asking for reassignment in

12    this case because I think you could actually draw a line from

13    the first sentencing through the third sentencing and see a

14    consistent theme here and a consistent series of errors.

15    Jackson I said, and this is a quote, "refusing to find

16    aggravating facts under the applicable preponderance standard,

17    it" -- the District Court -- "repeatedly indicated that it

18    would not make any factual findings that were not necessarily

19    found by the jury or shown beyond a reasonable doubt."  Fast

20    forward to the second sentencing.  The District Court applied

21    the aggravated assault guideline to just one group, one count,

22    Count 10, that was C's hypernatremia.  And why did the Court

23    do that?  The Court said, "The language of the charge and the

24    juries having convicted on that charge" {close quote} compels

25    that finding.  The Court then said, "I don't need to worry

1    about whether the Government has properly instructed the

2    jury."  The Court didn't find any other injuries or aggravated

3    assaults, refused to make those findings unless they were

4    compelled by the jury.  So arguably, the Court violated the

5    mandate in Jackson I right there.

6         Let's move to the third sentencing.

7              JUDGE SMITH:  She had a different view of the law,

8    quite clearly, right?

9              MR. ROMANO:  Yes.  And Your Honor, and throughout --

10   through all three, the Court has said, despite what this Court

11   has said, does it want to make findings by a preponderance of

12   the evidence?  Does it think it's fair?

13             JUDGE SMITH:  Thinks there's a Constitutional issue.

14             MR. ROMANO:  Thinks that the Government has done

15   something wrong.  The Government has done nothing wrong here

16   in charging this case.  But I move ahead to the third

17   sentencing, the one that's at issue here.  This is on page

18   9021.  The Court said it would not {quote} "fill in" {unquote}

19   holes by preponderance, {quote} "particularly where the

20   Government has crafted the charge and has here argued

21   successfully that the degree of harm need not be presented to

22   the jury."  This is on page 9042.  The Court said that the

23   harm caused by the hot sauce on toddlers, toddlers and babies,

24   {quote} "is what the Government chose not to ask for a jury to

25   wrestle with."  9043, the Court said that the jury could have

1    {quote} "been instructed on proof beyond a reasonable doubt"

2    {close quote} and that the defense {quote} "would demand that

3    the jury hold the Government to its burden of proof beyond a

4    reasonable doubt, or acquit."  In other words, the Court is

5    refusing to find facts that aren't compelled by the jury's

6    verdict in this case.

7         JUDGE RESTREPO:  What should the Court do?  Let's

8    assume we send it back.  What should the Court do?  Should the

9    Court take each of the counts of conviction and apply the

10   aggravated assault guidelines to each of the counts of

11   convictions, assuming the Court finds by a preponderance of

12   the evidence, the evidence satisfied it?

13        MR. ROMANO:  Yes, Your Honor.  And the commission

14   counts.  So we separated the counts between omission counts,

15   those were the neglect counts --

16        JUDGE RESTREPO:  Okay.

17        MR. ROMANO:  -- and the Government has all along

18   said, aggravated assault guideline won't apply to those

19   because there is no sufficiently analogous guideline.  That

20   was the issue in Jackson I.  For the other counts, the

21   Government believes that the aggravated assault guideline

22   should apply to all –

23        JUDGE RESTREPO:  What counts specifically there?

24        MR. ROMANO:  So those are groups -- they're groups 1

25   through 5, and the counts are -- let's see if I can find that.

1    For Joshua it would be Counts 1 through 3; group 2 for C is

2    Counts 1 and 12; group 3 for C is groups 9 and 10; and the

3    Court has already found the aggravated assault guideline as to

4    those.  Group 4 for J is Counts 1 and 6, and group 5 for J is

5    Count 5.  And Your Honor, and going back to what Judge Smith

6    asked at the initial question, I think you could just -- I

7    mean, I think that you're going to hear a lot in this case.

8    There's a lot of stuff floating around, there's a lot --

9    there's a big record here.  I think all this Court needs to do

10   is look at -- let's see if I can find this.

11           JUDGE MCKEE:  It's page 100.

12           MR. ROMANO:  Excuse --

13           JUDGE MCKEE:  It's page 100, what are you looking

14   for, of that second opinion?

15           MR. ROMANO:  Page 100.  Page 100 of Jackson II --

16           JUDGE MCKEE:  (Indiscern.).

17           MR. ROMANO:  -- lays out the analysis.  It says

18   consider these injuries not in isolation but together with the

19   jury verdicts.  It then sets forth the jury verdicts, and then

20   it has a very nice paragraph about what to do.  Consider these

21   things all together.  And I can go through the analysis, but

22   all I need you to do then is look at page 9040 of the

23   appendix.  That's where the Court goes through the -- that's

24   where the Court analyzes group 2, which is the marks, the

25   scars on C, including the humerus fracture.  And what does the

1    Court say?  The Court says, well, the defense sentencing

2    experts are really well credentialed.  They said it was

3    eczema, so it's eczema.  That's what the Court said.  That was

4    the Court's entire analysis on that count.  Did the Court

5    consider the jury verdicts that the jury had found beyond a

6    reasonable doubt that C had been physically assaulted by

7    objects and implements or by hands?  No.  Did the --

8                JUDGE MCKEE:  Did she conclude the fracture as being

9    eczema?

10                MR. ROMANO:  The fracture, she said, wasn't caused

11    by the Jacksons.

12                JUDGE MCKEE:  Okay.

13                MR. ROMANO:  Now what's the evidence of that?  I'll

14    just quick detour.  There was one -- I don't even think it was

15    a witness.  There was one doctor who looked at one x-ray and

16    said, "Well, I think that injury could have happened anywhere

17    between birth and two years."  At two years is when she left

18    their custody.  She was out of their custody between birth and

19    two months.  So in other words, it might have happened in that

20    little timeframe, but it could have happened in this entire

21    period.

22                JUDGE SMITH:  Mr. Romano, I hate to sound ignorant

23    about this, but I will admit it.  What is the doctrine of

24    chances?  I have not seen that invoked before.  I've been

25    around a long time.  I am well familiar with probability

1    theory.  What is it and how, if at all, does it enter into

2    what you're just describing, that is the need to look -- our

3    directive to look at the children's injuries collectively?

4             MR. ROMANO:  Your Honor, I think it's just sort of a

5    fancy way of saying what we all know, which is you've got to

6    sort of put everything together to really understand what's

7    going on.

8             JUDGE SMITH:  I think both sides have used the term

9    at some point.  You -- I know it's in the Appellee's brief

10   this time around, but the Government may have even used it in

11   the past.

12            MR. ROMANO:  It's -- it came from a Seventh Circuit

13   case, Your Honor, and I don't remember the case name, but the

14   idea was, and I think it's applicable here, I raised it at the

15   second sentencing hearing, if a man wins the lottery once,

16   he's congratulated.  If he wins it twice, you start to wonder.

17   Here, you put everything together, and I think this Court has

18   an almost identical doctrine in a child abuse case itself,

19   Adan, A-D-A-N, and that's in our brief, where the judge said,

20   well, you know, I can explain that, and I can explain that,

21   and I can explain that, but when you look at the whole thing

22   you say, well, really?  Could we really find innocent

23   explanations for every single one of these things when we know

24   the constellation of what's going on?  And I think --

25            JUDGE SMITH:  Well, a mathematician could probably

1    come up with an actual probability for an event given certain

2    number of factors that are presented to her.  It sounds like

3    this is sort of a crude way of referring to the probability of

4    an event occurring or not occurring.

5           MR. ROMANO:  Yes, I think that's fair, Your Honor.

6    And I think if you look at -- and again, I'm a little off

7    track here, but if you look at everything that the Court

8    should have considered here, let me run through that analysis

9    just on Count 12.  Because when I say it out loud, you realize

10   how extreme this is.  The District Court could have, let's

11   say, and I'll agree, could have looked at the Defendant's

12   sentencing experts.  Though as we say, and I think even the

13   Defendant agrees -- and I just want to put a page number on

14   the record, 7389, that's where the Defendant agrees that those

15   doctors looked at everything in isolation.  So they agreed

16   with the Government about that.  Defendant thinks that's the

17   right way to do it.  This was before Jackson II.  Okay.

18   District Court could look at that and say, okay, these are

19   experts, they say it's from eczema.  Great.  What else should

20   the Court have looked at?  Well, the jury found beyond a

21   reasonable doubt that C was abused with hands and objects.

22   The jury found that C was starved, was withheld -- food was

23   withheld from her, water was withheld from her, medical

24   treatment was withheld from her.  We know that C, when she

25   went to the hospital with hypernatremia, that the doctor –

1  this is just happenstance -- the doctor had also treated

2  Joshua, and he said -- this is page 222 of the record -- he

3  had -- only one other child came to mind, Joshua.

4          JUDGE SMITH:  Counsel, I think maybe it came from

5  you or from your office that we'd be referring to the children

6  involved here, the young people involved here, by name.  Now

7  Joshua, I think, you had indicated we could refer to by name,

8  is that correct?

9          MR. ROMANO:  Yes.

10          JUDGE SMITH:  I just wanted to make sure we were on

11  the same page there.

12          MR. ROMANO:  Yes.  So Joshua looked -- it's the only

13  child that the doctor even remembered.  But of all the kids

14  that he had seen, that's the one that came to mind.  Well,

15  what do we know about Joshua?  Joshua, the jury found, was

16  physically assaulted with hands and objects.  Same thing.

17  Joshua had, I don't even know, nine different injuries.  What

18  else do we know?  We know that the treating physician, or the

19  treating doctors who actually saw C, said these marks weren't

20  eczema, most of them.  We have the treating physician wrote a

21  sentencing letter, said I think that they were from

22  implements.

23          JUDGE MCKEE:  Think they were -- I'm sorry.

24          MR. ROMANO:  From implements.  From getting hit.  We

25  have C left the Defendant's custody, hasn't had those issues

1  anymore.  We have evidence that Carolyn lied about where they

2  came from, said that the birth mother caused them.  You put

3  all of these things together and you say -- and I just want to

4  close here; I know my time is up -- but note 8 of Jackson II,

5  it defies common sense to think that the jury found all of

6  those things happened, but that they didn't cause these

7  injuries.

8          JUDGE RESTREPO:  Question for you.  Very unusual in

9  the Pre-Sentence Reports, that there was language in the Pre-

10 Sentence Reports that read along the lines of the -- we

11 haven't calculated the guideline range because you've asked us

12 not to.  What's the story there?

13         MR. ROMANO:  The story there, Your Honor, is that

14 during the first sentencing hearing, the District Court found

15 that the Government had submitted proposed language for the

16 narrative in the Pre-Sentence Report.

17         JUDGE SMITH:  Is that unusual?

18         MR. ROMANO:  That's not unusual in our -- we said

19 that's what we always do.

20         JUDGE SMITH:  Right.  I spent 14 years in the

21 District Court working with Pre-Sentence Reports and probation

22 officers and what I knew about the process at least from afar,

23 I didn't think that that was an unusual experience.

24         MR. ROMANO:  No, we did not think that was unusual,

25 Your Honor.  The District Court decided that -- was not happy

1    with that, struck, you will notice if you look at the PSR,

2    there are no -- there's no facts at all, struck the entire

3    factual record basically from the PSR and then asked probation

4    not to do any analysis.  So, for Jackson II and Jackson III,

5    there is no probation analysis, it comes solely from the

6    parties.

7         JUDGE MCKEE:  Well, there's another point.  I think

8    that maybe what my colleague was getting at.  The Probation

9    Office was instructed not to do a guidelines calculation.

10        MR. ROMANO:  That's right.  So the PSR has no

11   guidelines calculation.  It comes solely from the Government

12   and from defense counsel.

13        JUDGE MCKEE:  And to quote my learned colleague, or

14   paraphrase him, do you know what's up with that?

15        MR. ROMANO:  Paraphrase?

16        JUDGE MCKEE:  Do you know what's up with that?  Im

17   putting -- kind of quasi quoting Judge Restrepo here.  How did

18   that come about?

19        MR. ROMANO:  The -- what are you --

20        JUDGE MCKEE:  The Court instructing probation not to

21   do a guidelines calculation.

22        MR. ROMANO:  That happened at the -- after -- you

23   know, following the first sentencing, the Court struck that,

24   and then going into the second sentencing said that she wanted

25   probation simply to update the PSR with what, you know, the

1    Defendant and the victims had been up to, but not to do an

2    analysis.

3            JUDGE RESTREPO:  So tell us the other part of the

4    argument, and we'll give you time here.  Let's assume we do a

5    remand.  Where do we go?  Does it go back to the same judge?

6    If so, why?  If no, why not?

7            MR. ROMANO:  Your Honor, we would ask that you

8    reassign this case.  It's been seven years to the day from the

9    first sentencing hearing.

10           JUDGE MCKEE:  Is that right, to the day?

11           MR. ROMANO:  Seven years to the day.  It's nearly

12    six years since I argued the first appeal in this Court.

13           JUDGE SMITH:  Judge Hayden explicitly acknowledged

14    that if this case goes back, it ain't going to her, right?

15           MR. ROMANO:  She did.

16           JUDGE SMITH:  She did.  And I acknowledge, I've

17    known Judge Hayden for a long time and have great respect for

18    her as a Trial Court Judge, as a District Judge.  I wonder if

19    not only was this an acknowledgment, maybe it was a tacit

20    expression of hope that if it came back it didn't go back to

21    her?  I know that you're not in a position to answer that one

22    way or another, but it did cross my mind.

23           MR. ROMANO:  Well, Your Honor, what I would say is I

24    think everyone, the District Court, this Court, the

25    Government, the Defendant, the victims, the children would

1    like to see this case come to a close at some point.  And, you

2    know, I anticipated maybe, you know, questions about whether -

3    - why we're still here, and the reason we're still here is

4    because --

5              JUDGE MCKEE:  I think we know why we're still here.

6              MR. ROMANO:  -- this is very serious.  These were

7    little innocent kids who are still really dealing with this.

8    And, you know, we would like just a shake, a fair shake at a

9    sentencing before a Judge with, you know, no procedural

10   errors, and hopefully come up with a sentence that is, you

11   know, more appropriate than the ones we've received.

12             JUDGE SMITH:  Well, and even beyond your preference,

13   Mr. Romano, and completely irrespective of how any of us feel

14   about our colleague, the District Judge here, there may also

15   be an appearance issue at this point in time as well that we

16   need to take into account, would you agree?

17             MR. ROMANO:  I do, Your Honor.

18             JUDGE RESTREPO:  Thank you.

19             MR. ROMANO:  Thank you very much.

20             JUDGE RESTREPO:  Mr. Waldman, can you hear us all

21   right, sir?

22             MR. WALDMAN:  I can.

23             JUDGE RESTREPO:  Good afternoon.

24             MR. WALDMAN:  Can you hear me?

25             JUDGE RESTREPO:  We hear you.

1           MR. WALDMAN:  Good afternoon, Judge.

2           JUDGE RESTREPO:  We hear you and we see you.  Good

3   afternoon.

4           MR. WALDMAN:  Great.  Great, thank you.  Good

5   afternoon to you.  Herbert Waldman, Javerbaum Wurgaft, for

6   Carolyn Jackson.  Your Honors, one of the things that Mr.

7   Romano said that I think was most incorrect is that Judge

8   Hayden didn't find the facts, she refused to find the facts.

9   She found the facts, she just didn't find them the way the

10  Government claims that they were.  She -- they also claim that

11  the doctors, the defense doctors, looked at the injuries in

12  isolation.  On page 11 of our brief we quote Dr. Christian,

13  who is -- who Judge Hayden considered to be a tremendous

14  expert, and I think her CV backs that up.  She said that she's

15  diagnosed thousands of children with abusive injuries over the

16  course of her career and was keenly aware, considering

17  injuries to multiple organ systems.  However, in this case,

18  while the children were maltreated, she found that many of the

19  injuries are not the result of abuse.  So A) Judge Hayden

20  found the facts, she based it on doctors who she found far

21  more credible than the experts that were presented by the

22  Government, and she looked at the -- she almost anticipated

23  this doctrine of chances argument.  She looked -- she said she

24  could look at the -- you have to look at the injuries

25  together, holistically, as we said earlier today, but that in

1    this particular case there are unique injuries that were not

2    caused by abuse.

3         JUDGE MCKEE:  When she looked at it, though, wasn't

4    her finding at the beyond a reasonable doubt level, that was

5    the reason I dissented in fact in the first case.  I thought

6    that she sentenced based upon the facts which she found and

7    injuries she found, but that she -- I didn't say this then;

8    it's clear from our cases, that -- Jackson I and Jackson II,

9    she was using a beyond a reasonable doubt standard rather than

10   a preponderance of the evidence standard, and we told her in

11   Jackson II to use a preponderance of the evidence standard.

12        MR. WALDMAN:  Well, the first time around she didn't

13   find the facts at all.  She was concerned, a concern that we

14   share and a concern that lingers with her, that there were

15   constitutional issues working when -- in this case, when the

16   jury doesn't find facts.  However, she --

17        JUDGE MCKEE:  That's exactly what I'm talking about.

18        MR. WALDMAN:  She expressly said "I am putting that

19   aside and I'm looking at the facts by a preponderance of the

20   evidence."  So, the direct answer to your question, Your

21   Honor, is no, she did not use the beyond a reasonable doubt

22   standard in her fact finding.  She expressly said that she's

23   using the standards that were directed by this Court.

24        JUDGE SMITH:  Mr. Waldman, you've pointed out where

25   you believe that Mr. Romano is wrong in saying she didn't find

1    facts, that indeed she did find facts.  But of course what

2    we're here for largely is to determine whether or not the

3    District Court adhered to our mandate in Jackson II.  And I'm

4    not sure, in fact I'm far from sure, that the District Court

5    has made findings for the aggravated assault guideline by

6    looking at each injury in the context of all the other

7    injuries that were reported, together with what would have

8    been the jury's findings.  I acknowledge that the District

9    Court acknowledged what the instruction was, and she did this

10   in her oral opinion.  But as you read through the record, it

11   seemed to me that all she did was track through each injury

12   independently and then explain why each individual injury was

13   more likely attributed to some explanation other than abuse by

14   the Jacksons.  And if I'm correct that that's what she did,

15   then isn't that patently contrary to what was the mandate of

16   Jackson II?

17            MR. WALDMAN:  No, I don't think that's what she did

18   at all, Your Honor.  Matter of fact, I think she did the

19   opposite.  When -- She had to make findings as to whether each

20   individual group was elevated to aggravated assault, and what

21   she said at the outset of the sentencing was I don't really

22   have to revisit each and every injury, as a matter of fact,

23   she felt she was being criticized for doing it that way,

24   injury by injury, she was doing it by the group.  So for

25   example, in the first -- in the sentencing immediately

1    preceding this one, group 1 was not treated as an aggravated

2    assault.  And these are injuries to -- I'm not sure if I

3    should use his name, Joshua, the child J.  And that included a

4    group of injuries, the humerus injury, a finger injury, a bile

5    duct injury, a head injury, and it didn't matter for guideline

6    calculation purposes whether she attributed one or all of

7    those injuries to assaultive behavior by the Defendants.  The

8    result was exactly the same.  So rather than going injury by

9    injury, she said okay, group 1, I've been told that it should

10   -- that aggravated assault should apply to more than group 3,

11   Count 10, and she did.  She said okay, I am counting group 1,

12   the injury to J, as an aggravated assault based upon the

13   injury that he sustained to his finger.  And that's sufficient

14   for guideline purposes.  Doesn't matter whether the other ones

15   were or weren't, and she didn't go there.  And she

16   intentionally didn't go there.

17            JUDGE RESTREPO:  But Jackson II very specifically

18   says, and I'm reading from Judge Roth's opinion, "We have

19   concluded that the Government adequately proved that several

20   of the children's serious injuries were in fact caused by the

21   Jacksons, thus we're left the definite and firm conviction

22   that a mistake was committed when the District Court failed to

23   apply the aggravated assault guideline to counts other than

24   10."  So how do you reconcile your argument with Judge Roth's

25   language with several?

1        MR. WALDMAN:  Well, she found that the -- there was

2    no question that the hypernatremia, two incidents, were caused

3    by Defendant, based on the jury verdict.  She found that the

4    finger injury was caused by Defendant and applied that to --

5    aggravated assault to that group of injuries.  She found that

6    the humerus injury was found by the -- was caused by the

7    Defendant.  Now if we are going to say that there are more

8    injuries -- if the Government is going to claim or if the

9    Court is going to decide that more injuries were caused by the

10    Defendants, I think someone ought to say what were those

11    injuries?  And Mr. Romano --

12        JUDGE MCKEE:  Yes, well, didn't we lay that out,

13    though, and that's what I pointed to or cited Mr. Romano to

14    page 100 of Jackson II, the children -- quoting from the

15    opinion, "the children suffered at least ten unusual and

16    serious injuries while in the Jacksons' custody.  For example"

17    -- and I think this name we can use -- "Joshua suffered, among

18    other things, a fractured bile duct, brain injury, fractured

19    skull, fractured humerus, fractured spine, gangrenous finger.

20    Another example, C suffered, among other injuries, a fractured

21    humerus, two bouts of acute hypernatremia, the serious

22    injuries each of which involved the protracted impairment of a

23    bodily function or required hospitalization should not be

24    viewed in isolation but rather must be viewed together with

25    the jury findings that the Jacksons were both guilty beyond a

1    reasonable doubt."  Isn't that -- we laid out what the

2    injuries were, we identified them, made it easy.

3          MR. WALDMAN:  Well, we know what the injuries are.

4    The question is were they caused by the Jacksons.  Your Honor

5    in the first Jackson opinion said there was going to be a

6    battle over causation, and there was.

7          JUDGE MCKEE:  And that was -- you got one vote

8    there.  That's not the law of this case.  And in the last

9    sentence there we laid out the fact that these injuries were

10   established.

11         MR. WALDMAN:  I have no question.  I'll give you two

12   easy examples from my perspective.  The bile duct injury was

13   one that Your Honor just read.  Now the physician who operated

14   on Joshua opened his abdomen, fixed the bile duct, saw the

15   organ, and his testimony was that there's no way this could

16   have been from assaultive conduct because if it had been,

17   organs in between the bile duct and his skin would have shown

18   signs of injury.  Now, I mean, I don't think -- I don't

19   consider it the law of the case that the bile duct injury was

20   caused by assaultive conduct.  To me, that proposition has

21   zero basis in reality.  And in fact -- I mean, and the other

22   example I would point to is the one that Mr. Romano used today

23   and used in his sentencing, and it's on page 9011, and I'll

24   just read it, it's very short.  It says, "the idea that C had

25   a humerus fracture in 0 to 2 months before she reached the

1    Jacksons, but that Joshua had the same unusual humerus

2    fracture, and that both the Defendants were convicted of

3    assaulting the kids for years but that C's humerus fracture is

4    unrelated, again defies common sense."   Now I understand the

5    argument, but you have to, I think, consider at the same time

6    that doctors -- the doctor -- we didn't pick the doctor.   The

7    child welfare agency in New Jersey sent the x-ray of C's

8    humerus to a doctor in Maryland who said that it could have

9    been a childbirth injury.   The Government says, and Mr. Romano

10   says, we dispute that, that this was a painful, obvious injury

11   that C had and that it should have been seen by people, people

12   should have noticed that.   So, he put that timing, when he

13   said that injury took place, and the timing was at a time just

14   after Mr. Jackson returned from Iraq, and at that time Dr.

15   Smith said Chaya had an injured humerus.   That's how he dated

16   the injury.   And so we had testimony from the woman who cared

17   for Chaya when the Jacksons went away for a short vacation

18   after Mr. Jackson's return who said there was no injury.   We

19   had pictures that Judge Hayden referred to of Chaya raising

20   her arm at a time when she supposedly couldn't.   So at trial,

21   Dr. Smith changed his dating.   The injury was now at an

22   earlier date.   But that injury couldn't have been at the

23   earlier date because she was in a hospital in Indiana part of

24   that time, and after the hospital she was back in New Jersey

25   and she was examined a couple of times by her pediatrician and

1   there's no mention of the injury.  So on the one hand, you

2   could have this common sense argument, but it's belied by the

3   facts of the record.

4          JUDGE RESTREPO:  Counsel, what do you make of the

5   questions we had for Mr. Romano about the Pre-Sentence Report,

6   the lack of guidelines calculations, and the instruction from

7   the District Court not to go there?

8          MR. WALDMAN:  I think my recollection, and this was

9   of many years ago, Judge Hayden was very unhappy with the Pre-

10  Sentence Report because it purportedly listed facts which were

11  all just the Government's contentions.  And the probation

12  department made no effort to independently find facts where

13  they were in dispute.  And I don't think -- I think it was

14  frankly beyond their ability to do that.

15         JUDGE SMITH:  What do you mean independently find

16  facts in the -- the Pre-Sentence Report was being done after a

17  jury determination where presumably facts had been found by

18  the jury.

19         MR. WALDMAN:  Well, you know, it depends on what the

20  facts were found by the jury.  The Pre-Sentence Report

21  contended that the Defendants were responsible for a lot of

22  the injuries which were #1) contested, and #2) not found by

23  the jury.  And now if I could respond to that briefly, let's

24  remember that the jury verdict on Joshua -- well, let me back

25  up.  The serious injuries that Judge McKee mentioned before

1    that Joshua had, all occurred in Oklahoma.  None of them

2    occurred in New Jersey.  The jury was instructed in Count 3,

3    that was -- that covered injuries that happened to Joshua in

4    New Jersey.  So the jury verdict didn't find any of those

5    injuries happened at all, much less were attributed to the

6    Defendant.  So, you know, and Count 1, which was this

7    conspiracy count that gave the entire menu of injuries, the

8    jury didn't have to find that any or all of those injuries

9    took place at all.  So, I think, as the Government has done

10   consistently, they're over-reading what the jury found,

11   because the jury wasn't asked to find a lot of these facts.

12        And I think so to get back to the original question, the

13   original PSR had all these fact finding about these injuries

14   which were in dispute.  So I think Judge Hayden said it's

15   really beyond the ability of the probation department to

16   resolve these disputes.  You know, they don't have the

17   expertise or the experience to decide what -- how these

18   injuries were caused or who caused them.  And then until you

19   decide the causation of these injuries, you really can't do a

20   guideline analysis.  You can't do a scoring.

21             JUDGE RESTREPO:  Thank you very much.

22             MR. WALDMAN:  Thank you.  I sort of lost track of my

23   time.  Are you indicating that it's over, Your Honor?

24             JUDGE RESTREPO:  That's what I'm indicating, yes.

25             MR. WALDMAN:  Okay.

1          JUDGE RESTREPO:  Thanks.

2          MR. WALDMAN:  Okay, sorry.  Thanks very much.

3          JUDGE MCKEE:  I wouldn't say it's over, but you're

4    out of time.

5          JUDGE RESTREPO:  Yes.

6          MR. WALDMAN:  Okay, thank you.  Thank you.

7          JUDGE RESTREPO:  Good afternoon.

8          MS. ARKEL:  May it please the Court, Louise Arkel

9    from the Office of the Federal Public Defender for Mr. John

10   Jackson.  I'd like to shift focus a little bit because I'd

11   like to take sort of a trip through the remands and how Judge

12   Hayden has approached each time, and I'd also like to start

13   with the Government refuses to acknowledge that some of the

14   decisions they made about charging this case and about how the

15   jury would be instructed would make the job of Judge Hayden

16   infinitely more difficult.  The judge -- and Judge Smith, you

17   mentioned that you're not as familiar with the case as perhaps

18   Judge McKee.  The Government refused to submit, did not want

19   to submit interrogatories to the jury that would allow them to

20   answer -- to provide questions -- answers about the degree of

21   harm.

22         JUDGE SMITH:  Specific interrogatories –

23         MS. ARKEL:  Right.

24         JUDGE SMITH:  -- during the trial, which are

25   essentially disfavored in criminal trials.  They're very, very

1    rarely used, but occasionally there is a reason for it.

2           MS. ARKEL:  And this is a very rare case.  It was

3    the first of its kind.  It as, as far as I know, the only --

4           JUDGE SMITH:  Is an assimilative crimes act case

5    unusual?

6           MS. ARKEL:  An assimilative crime case isn't that

7    unusual, but a child abuse case with what this Court has

8    acknowledged is a very unclear statute, a morass, as I think

9    it must have been Judge Cowen – I forget who said morass,

10   but –

11          JUDGE RESTREPO:  Well, not withstanding the Judge's

12   being upset with the Government or the Government objecting,

13   she could have instructed the jury, that way the defense could

14   have asked that the jury be instructed with interrogatories.

15          MS. ARKEL:  We did ask.

16          JUDGE RESTREPO:  And the Judge could have charged

17   with interrogatories.

18          MS. ARKEL:  She could have --

19          JUDGE RESTREPO:  But she didn't.

20          MS. ARKEL:  -- but she respected the Government's

21   decision --

22          JUDGE RESTREPO:  Well, she --

23          MS. ARKEL:  -- I mean the Government's choice of how

24   to proceed, because in part, it --

25          JUDGE RESTREPO:  All right, but she did.  At the end

1    of the day she opted not to.  It was her -- at the end of the

2    day it's her choice as to how she's going to charge the jury,

3    not the Government's.

4         MS. ARKEL:  Correct.

5         JUDGE SMITH:  And it's not for a judge to be

6    criticizing -- at least in the very rare case -- the

7    prosecution for how they, on a discretionary basis, exercise

8    their charging function, so long as they have evidence to

9    support the charges that have been filed.

10        MS. ARKEL:  Respectfully, I don't think there was

11   any criticism there.  I think it was an observation of fact

12   that it would make it more difficult, and it did make it more

13   difficult.  And Judge McKee, in your dissent, you noted --

14        JUDGE SMITH:  Excuse me, I'm -- maybe I'm

15   misunderstanding something.  I thought that at least the

16   implication was that the Government had made things more

17   difficult for Judge Hayden by both charging decisions as well

18   as decisions that had to do with how this case was presented

19   to the jury.  Maybe I misunderstood you.

20        MS. ARKEL:  She observed that the failure to -- that

21   not submitting, not asking the jury about the degree of harm

22   would make it more difficult to make those kinds of findings

23   at sentencing.  I believe it was just --

24        JUDGE RESTREPO:  But that was her decision.

25        MS. ARKEL:  Well, perhaps she made the wrong one.

1            JUDGE RESTREPO:  Well, it's --

2            MS. ARKEL:  We think she made the wrong one.  But

3    she respected the Government's discretion and she plowed

4    ahead --

5            JUDGE SMITH:  Discretion to do what?  The

6    Government's discretion to do --

7            MS. ARKEL:  The Government's choice to not -- the

8    Government's objection to those interrogatories.

9            JUDGE SMITH:  But as Judge Restrepo has said, they

10    can object all they want to.  A United States District Judge

11    is one of the most powerful people in the world.  They -- a

12    lot more so than the Court of Appeals Judges.  They're the

13    sole decider.  She could do what she wants to.

14            MS. ARKEL:  Well, it ended up being as difficult as

15    she anticipated making those findings.  She made a decision at

16    trial, at the first sentencing, that she couldn't make those

17    findings of fact, based on an argument that we made.  She --

18    it split -- again, it split the Court.  It wasn't a frivolous

19    argument.  It was an unusual case, an unusual argument.  She

20    made what this Court determined was the wrong decision.  When

21    it came back on remand, she took to heart, and if you read the

22    second -- the transcript of the second sentencing, it is very

23    clear that she took so seriously to heart Judge -- the words

24    in Judge Cowen's opinion, that it would be difficult to

25    connect each count to a particular incident or condition.  The

1    implication being she was supposed to, so she did.  Once

2    again, an unusual case, an unusual decision.  And I don't

3    think she -- you know, I am defending Judge Hayden and I think

4    she took a difficult case and followed -- did her best to

5    follow those words.  She took them seriously.  It comes back

6    up --

7          JUDGE SMITH:  There is no question that she took

8    this case very seriously and sincerely so.

9          MS. ARKEL:  And it comes back on remand, and the

10   parties arrive -- the Government arrives at sentencing, and

11   one of the first things they say to her is a lot of this is

12   settled, a lot of this is taken care of.  We've agreed upon

13   the grouping structure; you only have to find one injury in a

14   group to find aggravated assault, that is completely handled.

15   Nonetheless --

16         JUDGE SMITH:  It was only the grouping that both

17   sides decided upon or both sides agreed to, though, is that

18   right?

19         MS. ARKEL:  Well, we also agreed to two -- to the

20   calculation of two groups minus the acceptance of

21   responsibility.

22         JUDGE SMITH:  Okay, thank you.

23         MS. ARKEL:  But she had every reason to believe that

24   that was how -- that that was settled, how to proceed.

25   Moreover, I want to add, before I forget, nowhere in Jackson

1    II did the mandate or did the Court say that she was not

2    responsible still for looking at the medical evidence.  She

3    was not supposed to ignore medical evidence.  That would never

4    happen in a case.  She was not to ignore the fact that she had

5    to make credibility determinations.  And this Court never said

6    her credibility determination -- her limited credibility

7    determination as to J -- as to JJ, was incorrect.  It didn't

8    opine either way.  The Government paints that credibility

9    determination as a blanket denial of his credibility, but it

10   wasn't.  It was his credibility as to daily beatings, which,

11   of course, that credibility determination would impact,

12   perhaps, the causation of certain injuries such as skin

13   conditions.  If you don't believe the children were beaten

14   daily, then maybe those skin conditions were not.  That could

15   have played into -- that may have played into her reasoning.

16   That's an important credibility determination that this Court

17   did not say she was precluded from making.  So the Government

18   acknowledged or represented to her that if you find a certain

19   -- an aggravated assault in a group, that group is handled.

20   Nevertheless, Judge Hayden went above and beyond what she was

21   required to do for that group, the calculation of that group,

22   and she made findings about various injuries.  The Government

23   disagrees with those findings, but she made the findings

24   nonetheless.  I believe in some sense that she is being held

25   to a standard, a guidelines plus standard in that sense.  She

1    did not have to make those findings.  And I think part of the

2    problem -- and so to go to reassigning on remand, I believe

3    her handling of the case on each remand should give this Court

4    absolute confidence that if it is remanded to her again for a

5    procedural error, which we don't believe there is, but if it

6    were handed to her again, she would take it seriously.

7              JUDGE RESTREPO:  What do we make of her comments?

8    She was --

9              MS. ARKEL:  Of her --

10             JUDGE RESTREPO:  Yes, she was -- her comments on the

11   record that she, in essence, anticipated this coming back and

12   she knew she wasn't getting it back.  What do we do with that?

13             MS. ARKEL:  I think it was -- you know, I can't read

14   her mind, but I think it may have been a moment of maybe she

15   predicted, you know, three strikes and I'm out, maybe it was a

16   moment of pessimism or, I don't know, insecurity.  Maybe

17   Federal Judges get insecure.  I do not believe she was saying

18   I want out, or I am definitely going to be out.  I do not

19   think she was backing out of the case.  I think it was just a

20   toss-off.  I do not think any more should be read into it than

21   that.

22             JUDGE MCKEE:  Exasperation?

23             MS. ARKEL:  I'm sorry?

24             JUDGE MCKEE:  Exasperation.

25             MS. ARKEL:  I don't even think it was that, Your

1  Honor.  I mean, perhaps.  We've all had moments.  I think, you
2  know, I've been with this case since the beginning.  We've --
3  I'm sure we've all had moments.  But no, there is no question
4  in my mind that Judge Hayden, if this were handed back to her,
5  she would handle it with the same diligence, thoroughness,
6  attempt to do the right thing, that she has handled both
7  remands.  And frankly --
8           JUDGE MCKEE:  But then what about the appearance
9  issue?  I think Judge Smith brought this up.  We talked about
10 it in our case in Kennedy, the appearance.  He wanted to go
11 back to Judge Hayden, whom I also have the greatest of respect
12 for; I think she's a wonderful Judge.  But the appearance of
13 sending it back to Judge Hayden as opposed to a {quote}
14 "neutral" tribunal?
15          MS. ARKEL:  I believe if you're -- I think she has
16 done her best to tease out every instruction that this Court
17 has given her.  She would again, and I actually think that
18 would send a very powerful message that it isn't three strikes
19 and you're out.  It's not, you know, as the Government has
20 criticized her even for that, for using sports metaphors.  I
21 mean, on the super petty level, the criticism has been
22 extraordinary.  She -- it's not three strikes and you're out.
23 She should have the opportunity in this extremely difficult
24 case to continue to tease through this very difficult case.
25 And I think the message would be -- Judge Hayden, I think, is

1   extraordinarily transparent, extraordinarily willing to share

2   her thinking on really difficult issues.  For example, I think

3   a classic example is her opinion of the variance she's given

4   for his -- for John Jackson's military service.  She's

5   explained in part, it's not the reason for her -- for the

6   variance, but it explains that she thinks there is a

7   disconnect between the public and the military.

8           JUDGE SMITH:  It was a factor, though, wasn't it?

9           MS. ARKEL:  Oh, it certainly was.

10          JUDGE SMITH:  That she permissibly -- very

11   permissibly could have considered.

12          MS. ARKEL:  Absolutely.

13          JUDGE SMITH:  She --

14          MS. ARKEL:  Oh, I think -- I'm sorry.

15          JUDGE SMITH:  She evinced a very sincere concern for

16   this family, for this family unit going forward.

17          MS. ARKEL:  Yes.

18          JUDGE SMITH:  Okay.

19          MS. ARKEL:  I apologize.  I didn't mean that the

20   military service wasn't the reason.  I mean, the rationale

21   that there's a disconnect.

22          JUDGE SMITH:  I understand.

23          MS. ARKEL:  But I think she was trying to explain

24   why she thinks it's so important, his military service.  And I

25   note that ironically, in Tomko, the Government compared the

1    Defendant there to someone -- well, they called him -- you

2    know, he was greedy and didn't have to do this.  It's not --

3    and they said it's not like he's served in the military, you

4    know, I think sort of dismissing his charitable work or

5    something to that effect.  Here Mr. Jackson did serve in the

6    military and Judge Hayden, I think, correctly honored that and

7    saw it as honorable.  But my point is that she is extremely

8    transparent.  That should be encouraged.  It should not be in

9    any way discouraged.  I think the law benefits from that.  Her

10   expressions of concern about judicial fact finding, there was

11   -- there's nothing wrong with a judge saying I have real

12   concerns about this.  She put them on the record and she

13   plowed forward.  How many judges expressed reservations about

14   the mandatory guidelines before they were not mandatory?

15   Many.  And it was really important to the evolution and the

16   feedback of the law that there was so much expressions of

17   concern.  Same with the crack powder guideline.  It should go

18   back to her for the very reason that this is a difficult case

19   and she is willing to struggle through.  The opposite, sending

20   it to another judge, I think sends a really unfortunate

21   message.  It certainly -- she does not meet the standard.  She

22   has been of the public appearance that she's not fair.  She

23   has ruled for the Government, she has ruled against the

24   Government, she has ruled for us, she has ruled against us.

25   Even in the enhancements, they're practically split in half,

1    who's -- you know, that she's ruled for and against.  I think

2    she is a model of how to battle through a tough -- we'll -- if

3    there is error, and I do not want to concede that there's

4    error, and I hope, however, if there -- if the Court does find

5    procedural error, it will not remark upon the substantive

6    reasonableness.  I think if you don't find procedural error,

7    this case is -- the sentences are substantively reasonable.

8    And I guess I'll only address that if the Court wants me to.

9        JUDGE SMITH:  There's no reason for us to reach

10   substantive reasonableness if we were to determine that the

11   mandate was not adhered to and that the matter should go back,

12   right?

13       MS. ARKEL:  Correct.  Is that a hint that I

14   shouldn't bother with substantive reasonableness?

15       JUDGE SMITH:  Well, I just -- I wrote Tomko, so, you

16   know, I'm interested in your answer.

17       MS. ARKEL:  Okay.  Well, Tomko -- I think this case

18   has enormous similarities, in a way, with Tomko.  But I will

19   just address the does the record as a whole reflect rational

20   and meaningful consideration of the 3553(a) factors.  I don't

21   think there can be any dispute that Judge Hayden worked

22   through the 3553(a) factors rationally and meaningfully.  Are

23   the reasons for the sentence logical and consistent with the

24   3553(a) factors?  Absolutely.  She took into account John

25   Jackson's work ethic, his military career, his lesser

1   culpability, the fall she mentions that he'd taken, struggling

2   -- lost his pension, had to start with, you know, manual and

3   low-paying jobs, has thankfully rebuilt to some degree, not

4   totally, but to some degree.  He kept that family united by

5   twice-monthly trips to the prison to see his wife, who was

6   incarcerated twice, and I don't want it forgotten that he is

7   serving a sentence.  He was sentenced to probation originally

8   and second time, and is now serving -- continues to serve a

9   sentence of home-imprisonment, which the Supreme Court has

10  said is -- represents a significant restriction of liberties.

11  If there's -- this case should be affirmed.  If it is sent

12  back for procedural error, it should go back to Judge Hayden,

13  and we should all continue to work through it.  It should be

14  affirmed, though, first and foremost.

15          JUDGE MCKEE:  A comment which is really troubling me

16  is the fact that I have tremendous respect for Judge Hayden,

17  but her comment -- and I think this was at the last

18  resentencing -- about brilliant, that if these measures had

19  worked that would have been brilliant parenting, something

20  very much to that effect.  That absolutely floored me, to tell

21  you the truth, I was just blown away by that.  Whether or not

22  -- forgetting the burdens of fact and which injuries were

23  caused by the Jacksons and which injuries weren't, there was

24  clearly a nucleus of conduct towards these kids that the jury

25  found, and there was a nucleus of conduct that we had set

1    forth at 100 -- page 100 of our last opinion.  In context with

2    the jury finding, we suggest that the judge should look at

3    that in terms of whether or not there's causation established

4    there.  But whether or not there is, just to say that the

5    tactics were brilliant, would have been brilliant parenting

6    had they worked, just absolutely flabbergasted me.  That more

7    than anything else.  That gave me pause about whether or not,

8    given the appearance of this, under Kennedy, it should go back

9    to Judge Hayden.

10           MS. ARKEL:  May I respond?

11           JUDGE MCKEE:  Please.  Yes, please.

12           MS. ARKEL:  Thank you, Judge.  If it's the comment I

13   think of, the brave comment, where she used the term brave --

14           JUDGE MCKEE:  Brilliant.  I thought she said it

15   would have been deemed brilliant had it worked.

16           MS. ARKEL:  I think we're referring to the same one,

17   and I think that has been taken very out of context repeatedly

18   through this case.  She was referring to Carolyn Jackson's

19   willingness to take in extend -- the children of extended

20   family to home school and to handle, very young -- a family of

21   five very young children.  She was saying if that had worked

22   out, if she had been able to handle all that, she would have

23   been called brave.

24           JUDGE MCKEE:  Okay, I'll take another look at it.

25           MS. ARKEL:  Okay, thank -- I really do think that

1    has been taken out of context.

2            JUDGE MCKEE:  Maybe you're right, but I'll just --

3    but I'll take another look at it, because that, as I said,

4    that floored me.

5            MS. ARKEL:  No, she was referring -- and I think

6    that's consistent with the fact that part of her -- the -- if

7    I can speak for Carolyn for a second, that she was speaking to

8    Carolyn being overwhelmed at times, particularly when John was

9    either --

10           JUDGE MCKEE:  With five kids, who wouldn't be

11   overwhelmed.

12           MS. ARKEL:  Right.  But particularly when John was

13   deployed and/or very busy with military service.  I think that

14   -- I truly -- that's one of the comments that it gets me every

15   time that it's mentioned, it truly was referring to her being

16   overwhelmed.  Not that she was -- she has spoken numerous

17   times about the "massive disapproval", and that's a quote, of

18   the parenting tactics.

19           JUDGE MCKEE:  Okay.

20           MS. ARKEL:  Thank you, Your Honors.

21           MR. ROMANO:  Your Honor, I -- Your Honors, I think

22   I'll be very brief.  I just want to put a couple of things on

23   the record in response, just one or two things.  Mr. Waldman

24   talked about the two incidents of hypernatremia, that the

25   Judge found both of those.  I think our reply brief is very

1    clear that the Judge found only one, didn't even talk about

2    the first hypernatremia at the third sentencing hearing.

3    There was some discussion about her finding Joshua's humerus,

4    also not true.  She found that the Defendants caused Joshua's

5    humerus fracture, but by accident, not an assault.  And this

6    is what Mr. Waldman said, this is pages 8584 through 85 of the

7    record, where Mr. Waldman said at the second sentencing

8    hearing the Court found the humerus fracture and the finger

9    {quote} "were not to have been the result of an assault."  So

10   she has never found that those injuries were the result of

11   assault.  The finger she found at the third sentencing, but

12   not the humerus.  So she found only two injuries, not several.

13       I want to just, very quickly because this came up, the

14   birth injury issue.  I referenced this picture at the

15   sentencing hearing.  It's page 6758.  It's a picture of C when

16   she was taken -- when the Jacksons got her, and so the

17   argument is that in this picture she has a broken humerus, but

18   when she's lying in that bed looking like a baby at 24 months,

19   that there she was perfectly fine, no humerus fracture there.

20   I think that's a little ridiculous.

21       The jury instruction issue came up.  I really want to be

22   brief on this, because I think it's really unfortunate that

23   the Government has really been punished on this sentencing

24   after sentencing after sentencing.  It's page 5460 to 78.

25   That's where the argument was on the jury instruction issue.

1    And Your Honors are right.  Obviously it's the Court's

2    decision on how to instruct the jury.  But what the issue was,

3    and I want to be real brief about this, the Defendants picked

4    out a particular definition that's in the New Jersey statute.

5    There's many, many ways to violate the New Jersey statute.

6    The problem is there a fourth degree crime and there's a

7    second degree crime.  New Jersey Courts have said those crimes

8    are identical.  The prosecutor could pick which one based on

9    the seriousness of the offense.  And that happens in federal

10   law too.  There's a case, <u>Batchelder</u>, that's a Supreme Court

11   case, the same exact thing happened.  The Defendants picked

12   out one particular definition and said we want the jury to

13   find this one beyond a reasonable doubt or it will acquit.

14   The Government said no, that's not how this statute works.  We

15   don't think you should have to charge that.  But the

16   Government said, look, we think that we could prove that.  So

17   what we would like to do is you instruct like we've asked, and

18   then you could ask a special interrogatory if you're

19   concerned.  Have the jury weigh in on that particular harm.

20   The Defendants said no, we want a lesser included instruction.

21   In other words, what we want is if you find that harm, it will

22   be a second degree offense; if you don't find that harm, it

23   will be a fourth degree offense.  That was wrong, and there

24   was no basis for the Government to agree to that.  The

25   District Court agreed and said it wouldn't instruct on that.

1    But the District Court then said, well, you might have trouble

2    at sentencing.  And now the Court has really held the

3    Government to that at every single sentencing saying, well,

4    it's the Government's charging decisions, that's why we're

5    here, that's all the problem.  And I just want to read page

6    numbers:  6491, 6576, 6703, 6714; that's at the first

7    sentencing.  8298, 8299, 8300; that's at the second

8    sentencing.  9020 to 21, 9042, 9043, 9046, 9075; that's at the

9    third sentencing where the District Court had said, you know

10   what, Government, you fought clarity, you made this hard on

11   everybody, and this is why we're here.  That's not true at

12   all.  And I give you an example that we could all agree with.

13   A mail fraud case, for example.  If the Defendant said Your

14   Honor, I want you to instruct that the jury has to find $10

15   million in loss in order to convict, the Government would

16   rightly say, no, Your Honor, that's not an element.  If the

17   District Court at that point said, you know what, you're

18   right, we won't instruct on that, but when we get to

19   sentencing, I won't find any loss, I think we would all agree

20   that that would be a gross abuse of discretion at sentencing.

21   So that's really what's going on here, and I think it's

22   unfortunate and wrong.

23        And finally, just on the reassignment point, Your Honor,

24   we would ask that it go to another Judge.  The Court didn't

25   follow Jackson II.  I think it's questionable whether she

1    followed Jackson I.  She hasn't really re-examined the case

2    despite all of these remands.  John still hasn't served a day

3    in prison, even though his guideline range has gone way up,

4    even though this Court has said they committed several

5    aggravated assaults.  We think it's time to go back to a

6    different judge so we can get a resolution in this case.  If

7    the Court has no questions, I'll rely on my papers.

8              JUDGE RESTREPO:  Thank you very much.

9              MR. ROMANO:  Thank you very much.

10             JUDGE MCKEE:  It's a tragic case all around, a very

11   tragic case.

12             JUDGE RESTREPO:  We'll recess.

13        (Court adjourned)

14

15                       CERTIFICATION
16   I, Lewis Parham, certify that the foregoing is a correct
17   transcript from the electronic sound recording of the
18   proceedings in the above-entitled matter.
19
20
21   *Lewis Parham*                       1/30/23
22
23   _____        _____
24   Signature of Transcriber              Date